# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Mary T. Roesler                                    Civ. No. 12-1982 (JRT/JJK)

        Plaintiff,

v.

Carolyn W. Colvin,                          **REPORT AND RECOMMENDATION**
Commissioner of Social Security,

        Defendant.

David W. VanDerHeyden, Esq., VanDerHeyden Law Office; and Eddy Pierre Pierre, Esq., Binder & Binder, PC, counsel for Plaintiff.

Ana H. Voss, Esq. Assistant United States Attorney, counsel for Defendant.

JEFFREY J. KEYES, United States Magistrate Judge

        Pursuant to 42 U.S.C. § 405(g), Plaintiff Mary T. Roesler seeks judicial review of the final decision of the Commissioner of Social Security (the "Commissioner"),[1] who denied Plaintiff's applications for disability benefits. The parties have filed cross-motions for summary judgment. (Doc. Nos. 9, 16.) This matter has been referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and D. Minn. Loc. R. 72.1. For the reasons stated

---

[1]     Carolyn W. Colvin became Acting Commissioner of Social Security on February 14, 2013. Colvin is automatically substituted as the defendant in this matter for Michael J. Astrue, the former Commissioner of Social Security. *See* 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

below, this Court recommends denying Plaintiff's motion, and granting Defendant's motion.

## BACKGROUND

### I.     Procedural History

Plaintiff protectively filed applications for disability insurance benefits and supplemental security income on November 20, 2008, alleging a disability onset date of November 13, 2008.  (Tr. 13, 138–51.)[2]  The Social Security Administration ("SSA") denied Plaintiff's claims initially on May 8, 2009 (Tr. 59–65), and upon reconsideration on May 27, 2009.  (Tr. 66–72.)  Plaintiff filed a timely request for a hearing before an Administrative Law Judge ("ALJ"), and testified at the administrative hearing on October 21, 2010.  (Tr. 73–74, 28–52.)  On November 30, 2010, the ALJ issued an unfavorable decision on Plaintiff's applications.  (Tr. 10–27.)  Plaintiff filed a timely request for review (Tr. 8), and the Appeals Council denied that request on June 14, 2012.  (Tr. 1–7.)  Denial of review made the ALJ's decision the final decision of the Commissioner.  *See* 20 C.F.R. §§ 404.981, 416.1481.  Plaintiff filed this action on August 14, 2012, seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  (Doc. No. 1.)  On October 29, 2012, Defendant filed an answer.  (Doc. No. 6.)  Thereafter, pursuant to D. Minn. LR 7.2, the parties filed cross-motions for summary judgment.  (Doc. Nos. 9, 16.)

---

[2]      Throughout this Report and Recommendation, the abbreviation ("Tr.") is used to reference the Administrative Record filed at Docket No. 7.

## II.    Factual Background

Plaintiff obtained a high school equivalency diploma and has past work as a sales attendant, fast-food worker, and customer-service representative. (Tr. 188, 191, 241.)  She worked for a cable company as a customer-service representative from September 21, 1999, through November 20, 2008.  (Tr. 191, 182.)  Plaintiff was 51-years old on November 13, 2008, her alleged disability onset date.  (Tr. 138.)  In her applications, she alleged disability due to epilepsy, lymphedema, sleep apnea, arthritis, depression, knee pain, and obesity. (Tr. 181.)

Plaintiff seeks reversal or remand of the ALJ's decision based primarily on her mental impairments.  She also raises an argument regarding her physical impairments that she needs to elevate her legs to heart level for 10-15 minutes, three to four times a day, and she contends this should have been included in her residual functional capacity ("RFC").  (Doc. No. 10, Pl's Mem. in Supp. of Mot. for Summ. J. ("Pl's Mem.") 20.)  Accordingly, this Court has reviewed the Administrative Record in its entirety, but will limit discussion of Plaintiff's medical records to her mental impairments, lymphedema, knee pain, leg pain, and obesity.

### A.    Medical Records Before the Alleged Disability Onset Date

Plaintiff fell on her right knee in February 2006.  (Tr. 423–26.)  An MRI of her knee showed severe degenerative changes in the medial compartment,

3

findings suggestive of an MCL tear, and a severe and chronic tear of the medial meniscus. (Tr. 426.)

In January 2007, Plaintiff reported new symptoms of upper leg pain and left leg numbness, that was worse with sitting. (Tr. 281.) She also had lower back pain and spasms in her calves, although she reported these improved since starting calcium, and she had leg edema that improved with treatment. (*Id.*) In addition, she complained of new memory problems and mental cloudiness. (*Id.*) Plaintiff's physical examination was completely normal. (Tr. 282.) Dr. H. Barkan recommended an MRI, EMG, EEG, lab tests, and neuropsychological testing. (Tr. 282.)

On February 7, 2007, Plaintiff had a lumbar MRI. (Tr. 274.) The MRI showed left L1-2 disk herniation, mild facet degenerative changes at L2-3 through L5-S1, and disc bulges at T11-12 and T12-L1. (*Id.*) Dr. Barkan diagnosed Plaintiff with myofascial back and leg pain and recommended physical therapy and a weight-loss program. (Tr. 280.)

On January 16, 2008, Plaintiff underwent a behavioral health intake at Waseca Medical Center with Dr. Bonnie Betts. (Tr. 319–22.) At that time, Plaintiff was depressed and apathetic. (Tr. 319.) She reported feeling irritable and making inappropriate comments at work. (*Id.*) She stated she knew she needed to work but found her customer-service job very stressful. (*Id.*) She also reported relationship problems and stated she had been treated for depression in the past. (*Id.*) Plaintiff stated that she went to church but had no real friends or

activities outside church. (Tr. 320.) She was dependent on her family because she did not drive due to epilepsy. (*Id.*) Her medications at that time were Depakote, Adderall, and Celexa. (*Id.*) On mental status examination, her attention and concentration were adequate but she acknowledged significant difficulty organizing and cleaning. (*Id.*) Her memory was intact but she acknowledged some difficulty learning due to lack of attention. (*Id.*) Her mood was dysthymic, and her speech was slow but even. (Tr. 321.) Her mental examination was otherwise normal. (*Id.*) Dr. Betts diagnosed Plaintiff with recurrent depression, dependent features, and gave Plaintiff a GAF score of 65.[3] (*Id.*) She recommended medication changes that would need to be coordinated with a neurologist due to Plaintiff's epilepsy. (*Id.*) Dr. Betts also recommended therapy with a goal of increasing exercise and change of lifestyle. (*Id.*)

In March 2008, Plaintiff saw Dr. Edward Wolske at the Waseca Medical Center and reported she believed her attention deficit hyperactivity disorder ("ADHD") was uncontrolled because she was having difficulty staying focused and on task, especially at work. (Tr. 266.) Her other concerns were fatigue, staring episodes, and chronic back pain. (*Id.*) Although she had known

---

[3]    The Global Assessment of Functioning scale ("GAF") is used by clinicians to subjectively rate the social, occupational, and psychological functioning of individuals. *Diagnostic and Statistical Manual of Mental Disorders* ("*DSM-IV-tr*") 32 (American Psychiatric Association 4th ed. text revision 2000). Scores of 61-70 indicate some mild symptoms or some difficulty in social, occupational, or school functioning, but generally the person is functioning pretty well and has some meaningful interpersonal relationships. *Id.* at 34.

peripheral edema, she did not have leg pain at that time. (*Id.*) Dr. Wolske increased her dose of Methylin to treat attention deficit disorder. (*Id.*) He also recommended Ibuprofen for her back pain, and support stockings and leg elevation for her lymphedema. (*Id.*)

On October 23, 2008, Plaintiff saw Physical Therapist Patty Fandrich for bilateral leg edema and chronic venous insufficiency, which Plaintiff represented had been present for years. (Tr. 462.) At that time, Plaintiff said she was doing well overall but she needed custom compression garments. (*Id.*) She was able to carry out independent daily and work activities, and her only pain complaint was of occasional achiness in the right knee. (*Id.*) She stated that her job required her to sit for ten hours per day, and she tried to put her legs up on a stool when possible. (*Id.*)

## B.     Medical Records After the Alleged Disability Onset Date

Plaintiff had a routine physical examination in March 2009. (Tr. 297–98.) Her concerns were chest pain and uncontrolled peripheral edema. (Tr. 297.) At that time, Dr. Wolske diagnosed Plaintiff with GERD, uncontrolled hyperlipidemia, seizure disorder, hypertension, ADHD, hypothyroidism, depression, peripheral edema, migraine headaches, and sleep apnea. (Tr. 297–98.) She was prescribed new medications for GERD and hyperlipidemia, and all of her other conditions were found to be stable. (Tr. 298.)

A state agency physician, Dr. Charles Grant, reviewed Plaintiff's social security disability file on April 17, 2009, and opined that Plaintiff was restricted to

medium exertional work.  (Tr. 299–309.)  On reconsideration of Plaintiff's disability applications, Dr. Sandra Eames reviewed Plaintiff's social security disability file and affirmed Dr. Grant's physical RFC opinion on May 26, 2009. (Tr. 350–52.)

On April 22, 2009, Plaintiff underwent a psychological consultative examination with Dr. Barbara Lowe-Fierke.  (Tr. 310–15.)  At that time, Plaintiff was five feet two inches tall and weighed 326 pounds.  (Tr. 310.)  She said the reason she was applying for disability was primarily physical but she reported suffering from depression and ADHD.  (*Id.*)  Her reported mental-health symptoms included depressed mood about four days per month, excessive worry, insomnia, grief and worthlessness, and problems focusing, especially at work.  (*Id.*)  She had suicidal ideation "every once in a while."  (*Id.*)  She stated she was first diagnosed with depression in 1997, and she was not sure if Celexa was helping her depression.  (*Id.*)  She stated the medication Methylin had helped her focus at work, but she stopped taking it after she left her job because she no longer needed it.  (*Id.*)  She also stated she had been in psychotherapy for six months and found it helpful.  (Tr. 311.)

In addition, Plaintiff provided Dr. Lowe-Fierke with the following history. She had been married and divorced twice.  (*Id.*)  She had two children, now adults, and her 23-year-old son lived with her.  (*Id.*)  Her relationships with her children were good.  (*Id.*)  Plaintiff had quit high school her senior year but later obtained her GED.  (*Id.*)  She had been in special education classes but did not

feel it had been necessary because the work was easy for her. (*Id.*) Plaintiff's last job was at a cable company, doing phone sales. (*Id.*) She quit in November 2008, before she could be fired for not making her sales quota and for having "some outbursts." (*Id.*) She attributed her deterioration at work to absence seizures and a change in medication. (*Id.*) She got along with all but one supervisor. (*Id.*) Plaintiff said she could no longer work because of her epilepsy, and that she needed a job that allowed sitting the majority of the time. (*Id.*)

Plaintiff described her daily activities as follows. She cared for her own hygiene, watched television, used her computer, and cooked and cleaned, although at a slower pace than before. (Tr. 312.) She had no problems finishing tasks or with being distracted. (*Id.*) She socialized only with family because she could not afford to go out with former friends. (*Id.*) She went outside a little bit every day. (*Id.*) She did not drive, so she had to get a ride to go shopping. (*Id.*) She used a motorized cart or leaned on a shopping cart to keep the weight off her knees while shopping. (*Id.*) Her son carried the groceries inside for her. (*Id.*) In the evening, she and her son sometimes went to a local bar to sing karaoke but did not drink alcohol. (*Id.*)

On mental status examination, Plaintiff presented as clean, casual, and appropriate. (*Id.*) Her gait was slow due to her weight. (*Id.*) She did not appear to be physically uncomfortable while sitting. (*Id.*) There were no concerns regarding her thought processes, and her speech was normal. (*Id.*) Her mood was good. (*Id.*) She admitted to current passive suicidal ideation without intent.

(*Id.*)  She was able to compute simple math problems, with the exception of division.  (*Id.*)  She could repeat five digits forward and three backward, which was in the low-average range.  (*Id.*)  She could spell "world" forward but not backward.  (*Id.*)  And her attention and concentration were variable.  (*Id.*)  Plaintiff did not report any long-term memory concerns, and her short-term memory appeared intact.  (Tr. 313.)  She demonstrated some deficits in social awareness and judgment, and her insight regarding mental and emotional impairment was likely somewhat limited.  (*Id.*)  Her impulse control was likely adequate, her intellectual ability appeared to fall in the well-below-average to low-average range, and her perception of pain was exacerbated by depression.  (*Id.*) Dr. Lowe-Fierke noted that Plaintiff had undergone neuropsychological testing in February 2007, and the intelligence test results were 88 verbal IQ, 70 performance IQ, and 77 full scale IQ.  (*Id.*)  In addition, her basic working memory was low average.  (*Id.*)  Plaintiff's profile results were abnormal, and the examiner assessed a deficit in the non-language domain and in executive functioning, possibly due to a long-standing seizure disorder.  (*Id.*)

Dr. Lowe-Fierke diagnosed Plaintiff with mild major depressive disorder and assigned Plaintiff a GAF score of 50.[4]  (Tr. 314.)  Although Plaintiff appeared to fit the profile of someone with ADHD, Dr. Lowe-Fierke found it more likely that her difficulty focusing was due to absence seizures.  (*Id.*)  She opined that

---

[4]    GAF scores of 41-50 indicate serious symptoms or serious impairment in social, occupational or school functioning.  *DSM-IV-tr 34.*

Plaintiff had a low-average ability to understand and retain information, her judgment was less reliable, and her depression was fairly well controlled. (*Id.*) Dr. Lowe-Fierke also opined that Plaintiff would likely have significant difficulties maintaining focus and maintaining concentration, persistence or pace, due to her seizure disorder. (*Id.*) But her ability to understand and remember instructions, and to tolerate coworkers, handle supervision, and manage stress appeared fairly intact. (Tr. 314–15.)

On May 1, 2009, Plaintiff saw Dr. Betts. (Tr. 323.) Plaintiff reported she was spending considerable time on her computer – looking up things of interest and playing games. (*Id.*) She was looking forward to an upcoming wedding, shopping trip, and swimming lessons. (*Id.*) She also reported she had a friend who would be visiting for several days, and Plaintiff would be caring for her granddaughters over Memorial Day. (*Id.*) Plaintiff said her stress was significantly decreased since she quit working. (*Id.*) And she hoped to lose weight through more exercise. (*Id.*) Dr. Betts noted that Plaintiff's mental status examination was normal, and she diagnosed Plaintiff with dysthymic disorder, adjustment disorder with depression that was improved, and dependent features. (*Id.*) Dr. Betts assessed Plaintiff with a GAF score of 75.[5] (*Id.*)

---

[5] A GAF score of 75 indicates that if symptoms are present, they are transient and expectable reactions to psychosocial stressors, and there is no more than slight impairment in social, occupational, or school functioning. *DSM-IV-tr* 34.

On May 2, 2009, State Agency Consultant J. Pressner reviewed Plaintiff's social security disability file and completed a Psychiatric Review Technique Form regarding Plaintiff.  (Tr. 326–39.)  Pressner opined:

> The claimant was referred for an evaluation with Dr. Lowe-Fierke who diagnosed MDD which she termed mild.  She supplied a GAF of 50 which does not seem consistent with her diagnosis . . . . The claimant's statements appear credible.  The claimant may suffer from depression, but the reports of functioning from the claimant and her mother do not suggest severe limitations due to a mental impairment.  The claimant appears to perform goal directed activities limited primarily by the claimant's physical condition.  The claimant's concentration and social functioning appear from these descriptions to be within normal limits.  Therefore it is reasonable to conclude the claimant's condition is not severely limiting at this time.

(Tr. 338.)  On May 26, 2009, Dr. Russell Ludeke reviewed Plaintiff's social security disability file on reconsideration of her applications and affirmed Pressner's opinion that Plaintiff's mental impairments were nonsevere.  (Tr. 353–55.)

On May 28, 2009, Plaintiff saw Dr. Wolske for complaints of difficulty sleeping, knee and back pain, and intermittent left thigh paresthesia.  (Tr. 370.) She also stated she needed disability paperwork completed.  (*Id.*)  On examination, Plaintiff had mild swelling of the left knee, with range of motion limited due to body habitus, and bilateral pitting edema.  (*Id.*)  Dr. Wolske opined that Plaintiff's knee pain was related to arthritis and obesity.  (Tr. 370–71.)  He started her on Ambien for sleep, and Lasix for edema, and "discussed elevation."

(Tr. 371.) Dr. Wolske stated the following in his report: "For the disability paperwork this was filled out with the stated reasons."[6] (*Id.*)

Thereafter, Dr. Wolske increased Plaintiff's Lasix in June 2009, when her pain worsened with the increase in temperature. (Tr. 374.) And Dr. Wolske saw Plaintiff again on August 14, 2009, when she reported that her mood was worse after her uncle recently passed away. (Tr. 378.) Dr. Wolske noted that Plaintiff was tearful at times but her insight and recall were good. (*Id.*) At that time, Dr. Wolske increased her Celexa. (Tr. 379.)

The record reflects that Dr. Betts sent a letter to Plaintiff's counsel on October 28, 2009. (Tr. 385.) In that letter, Dr. Betts indicated that she saw Plaintiff nine times since January 2009.[7] (*Id.*) She also stated:

> Initially, [Plaintiff] was reevaluated for her depression which continues to be a chronic mild form called a dysthymic disorder. She also demonstrates executive function deficits, often resulting in poor decisions that contribute to functional losses.
>
> Most recently, her decision to quit her job has left her bereft of financial support. Her lifestyle also contributes to problems in housing. Health problems are complicated by her weight and inability to exercise due to joint pain. Therapy focuses on helping her make lifestyle changes and developing a solution-oriented approach to problem solving.

(*Id.*)

---

[6]   There is no disability opinion by Dr. Wolske in the Administrative Record.

[7]   There is only one treatment record dated between January 2009 and October 28, 2009, from Dr. Betts in the Administrative Record, and it is dated May 1, 2009. (Tr. 323.)

In April 2010, Dr. Lucas Hammel provided Plaintiff a routine physical examination. (Tr. 397–99.) Dr. Hammel's notes reflect that Plaintiff was seizure free for "quite some time, and her last EEG was stable." (Tr. 397.) Plaintiff's depression was also in remission. (*Id.*) Dr. Hammel noted that Plaintiff "relates that she occasionally has a blue day, but not that often," and that Plaintiff struggled with obesity, but otherwise she stated she felt well. (Tr. 397–98.)

On March 5, 2010, Dr. Betts completed a Psychiatric/Psychological Impairment Questionnaire regarding Plaintiff. (Tr. 551–58.) Therein she stated that she first saw Plaintiff in July 2008, and saw her only sporadically after her first three appointments. (Tr. 551.) Dr. Betts diagnosed Plaintiff with dysthymic disorder; personality disorder, NOS, dependent features; and she assessed a GAF score of 60, with a lowest score of 50 in the past year.[8] (*Id.*) Dr. Betts noted that Plaintiff's clinical findings were weight change, anhedonia or pervasive loss of interests, psychomotor retardation, feelings of guilt/worthlessness, social withdrawal or isolation, and decreased energy. (Tr. 552.)

Dr. Betts opined that Plaintiff was markedly limited in (1) completing a normal workweek without interruptions from psychologically based symptoms; (2) performing at a consistent pace without an unreasonable number and length of rest periods; and (3) traveling in unfamiliar places or using public transportation. (Tr. 555–56.) Dr. Betts opined that Plaintiff was moderately

---

[8]     GAF scores of 51-60 indicate moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.*

limited in her ability to (1) perform activities within a schedule, maintain regular attendance, and be punctual within a customary tolerance; (2) work in coordination with or proximity to others without being distracted by them; (3) interact appropriately with the general public; (4) accept instructions and respond to criticism from supervisors; (5) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; (6) respond appropriately to changes in the work setting; and (7) set realistic goals or make plans independently.  (Tr. 554–56.)  And Dr. Betts opined that Plaintiff was mildly limited in her ability to (1) understand, remember, and carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) sustain an ordinary routine without supervision; (4) make simple work related decisions; and (5) get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (Tr. 554–55.)

Dr. Betts also noted that Plaintiff quit her last job due to increased demands causing her to decompensate (Tr. 556), and stated that Plaintiff's psychiatric condition exacerbated her pain.  (Tr. 557.)  Ultimately, Dr. Betts opined that Plaintiff was capable of low-stress work, which she described as a sheltered position with positive coaching.  (*Id.*)  She questioned whether Plaintiff had reduced intellectual functioning but had not done testing.  (*Id.*)  She also questioned whether Plaintiff could manage benefits in her own best interests. (Tr. 558.)

In June 2010, Dr. Betts wrote another letter to Plaintiff's counsel, stating that she saw Plaintiff five times between August 14, 2009, and April 15, 2010.[9] (Tr. 420.)  Dr. Betts stated that "[Plaintiff] displays impulsive decision making with poor judgment which has contributed to financial hardships within her household." (*Id.*)  Dr. Betts also stated that her therapy with Plaintiff focused on decision making and "management of hopelessness and despair when she has had episodes of depression." (*Id.*)

On September 17, 2010, Nurse Practitioner Nancy Knudtson evaluated Plaintiff for right foot pain.  (Tr. 563–67.)  Plaintiff had a history of vascular insufficiency with peripheral edema and lymphedema, which was treated with Lasix in the past.  (Tr. 563.)  She reported that she felt pain only when walking on or moving her foot.  (Tr. 565.)  On examination, Plaintiff had edema of the right foot, with normal range of motion and steady gait.  (Tr. 563–64.)  Nurse Practitioner Knudtson prescribed Lasix.  (Tr. 564.)

## III.  Testimony at Administrative Hearing

Plaintiff, represented by counsel, testified as follows before ALJ Jo Ann Draper on October 21, 2010.  (Tr. 28–52.)  At the time of the hearing, Plaintiff was five feet two inches tall and weighed 303 pounds.  (Tr. 36.)  She last worked on November 13, 2008, and lost her job due to depression and difficulty getting along with coworkers.  (*Id.*)  While working, she felt paranoid that others were

---

[9]     These treatment records are not in the Administrative Record.

against her.  (Tr. 37.)  Her symptoms improved and she had few psychiatric symptoms after she quit working.  (*Id.*)  She had some trouble with attention and concentration, especially when reading, her memory was poor in that she forgot what she was going to say in mid-sentence, and she was easily distracted from finishing tasks.  (*Id.*)  She would rather be by herself than in groups of people, and she had trouble accepting criticism.  (Tr. 37–38.)

Physically, Plaintiff had pain in the right knee "every so often," particularly when it was raining, and it hurt more when she walked.  (Tr. 38.)  After walking, she had to put her leg up for 10-15 minutes, and she did this about three times a day.  (*Id.*)  Plaintiff also had pain in the low back, and bending, walking, and playing with her grandkids made her back pain worse.  (Tr. 38–39.)  On an average day, she rated her pain five on a scale of one to ten, and she used Ibuprofen for treatment.  (Tr. 39.)  With exertion, her pain increased to six or seven out of ten.  (*Id.*)  Plaintiff also had trouble with swelling in her legs, about once every three months, caused by water retention.  (Tr. 39–40.)  When her feet or legs swelled, it lasted several weeks and was very painful.  (Tr. 40.)  When that happened, walking helped and so did elevating her legs above her heart. (*Id.*)

Plaintiff testified that the last time she had a seizure it lasted only a second, with her staring into space until someone called her name.  (Tr. 41.) Plaintiff did not have petit mal seizures very often.  (Tr. 41–42.)  And she felt fine when the short seizure was over.  (Tr. 42.)

Plaintiff lived with her daughter, daughter's boyfriend, and grandkids.  (*Id.*)
She spent six to eight hours a day watching television, sitting in a recliner with
her legs up.  (*Id.*)  She also sat in the recliner to read, crochet, and write letters.
(Tr. 43.)  She could stand for only 10-15 minutes before her legs felt rubbery or
numb.  (Tr. 44.)  And she could walk for 5-15 minutes and was comfortable lifting
about ten pounds.  (*Id.*)  Plaintiff also testified that she had side effects from
medication – Depakote caused weight gain, and her blood-pressure medication
made her lymphedema worse.  (*Id.*)

Melinda Stahr testified at the hearing as a vocational expert.  (Tr. 47, 241.)
In a written report, Stahr identified the occupation codes in the Dictionary of
Occupational Titles ("DOT") that corresponded to Plaintiff's past work as a sales
attendant,[10] fast-food worker,[11] and customer-service representative.[12]  (Tr. 241.)
The ALJ asked Stahr to assume a hypothetical individual with the same age,
education, and work history as Plaintiff, and that the individual would have the
following work limitations:

> Light work activity, specifically lifting and carrying no more than 20
> pounds occasionally, more frequently throughout the day lifting and
> carrying up to 10 pounds at a time.  Standing and walking would be
> no more than six hours a day and sitting would be no more than six
> hours a day.  Now this individual should not be exposed to
> hazardous working conditions such as working around heights or

---

[10]     *See* DOT Code 299.677-010.

[11]     *See* DOT Code 311.472-010.

[12]     *See* DOT Code 219-387-010.

> moving machinery and this individual would be precluded from
> performing highly detailed, highly complex job tasks.  That would not
> necessarily preclude lesser detailed or more moderately detailed or
> high, but not highly detailed, highly complex work.

(Tr. 47–48.)  Stahr testified that such a person could perform all of Plaintiff's past

relevant occupations.  (Tr. 48.)

For a second hypothetical question, the ALJ kept the same nonexertional

limitations as in the first hypothetical question but limited the person to sedentary

work, lifting and carrying no more than ten pounds occasionally, five pounds

frequently, standing and walking two hours per day, and sitting from six to eight

hours per day.  (*Id.*)  Stahr testified that such a person could perform Plaintiff's

past occupation as a customer-service representative.  (*Id.*)

In a third hypothetical question, in addition to the sedentary work

limitations, the ALJ inquired of an individual that would need to change postural

positions every thirty minutes, and to stretch for two or three minutes before

returning to a seated position.  (Tr. 48.)  The person would not need to leave the

work area or job tasks to stretch.  (Tr. 49.)  Stahr testified that the DOT did not

outline such a work restriction, but in her professional opinion, most employers

for the type of customer-service job they were talking about would offer a

sit/stand workstation.  (*Id.*)  However, the fast-food worker and sales-attendant

occupations would not accommodate a change of postural position every thirty

minutes.  (*Id.*)

Plaintiff's counsel then asked Stahr whether a person under the second hypothetical question, with the additional limitation of unskilled work, could perform the customer-service job.  (Tr. 49–50.)  Stahr testified that such a person could not perform the customer-service job.  (Tr. 50.)  Stahr also testified that if a person needed to elevate her legs above heart level for 10-15 minutes, three or four times a day, it would preclude competitive employment.  (*Id.*)  If, however, the person needed only to elevate her legs to chair level, some employers would make the accommodation.  (*Id.*)  But such a limitation would limit access to 50% of such jobs.  (Tr. 50–51.)

## IV.   Plaintiff's and Third-Party Function Reports

Plaintiff's mother completed a third-party function report regarding Plaintiff for the Social Security Administration on December 15, 2008.  (Tr. 169–76.)  She indicated that Plaintiff had no trouble with personal care, and that Plaintiff cooked daily, cleaned, and did laundry.  (Tr. 170–71.)  Plaintiff's mother also stated the following about Plaintiff.  She was able to go shopping, but she did not drive due to epilepsy.  (Tr. 172.)  Plaintiff's hobbies were television, computer, arts, and crafts.  (Tr. 173.)  Plaintiff did not have problems getting along with family, friends, or neighbors.  (Tr. 174.)  She had difficulty lifting, squatting, bending, standing, reaching, walking, kneeling, and stair climbing.  (*Id.*)  She followed written and spoken instructions well, and she got along well with authority figures, if she was treated fairly.  (Tr. 174–75.)  She had a hard time handling stress, but she handled changes in routine fairly well.  (Tr. 175.)

The record reflects that Plaintiff also completed an undated function report that stated the following.  (Tr. 201–08.)  Plaintiff lived with her son.  (Tr. 201.) She cleaned her house, but had to have her feet up half the day.  (*Id.*)  She cooked daily.  (Tr. 203.)  She went grocery shopping for one hour per week. (Tr. 204.)  She spent a lot of time watching television and she used her computer every day to play games.  (Tr. 205.)  She could only walk ten feet before having to rest.  (Tr. 206.)  She could pay attention for two hours and follow written directions very well.  (*Id.*)  And, she had some trouble getting along with coworkers because she "would say what I feel."  (Tr. 207.)

## V.  The ALJ's Findings and Decision

The ALJ issued a decision on November 30, 2010.  (Tr. 10–27.)  The ALJ followed the five-step procedure for determining if an individual is disabled.  *See* 20 C.F.R. § 404.1520(a).  She found that Plaintiff had the following severe impairments: morbid obesity, chronic venous insufficiency and peripheral edema, history of epilepsy, degenerative joint disease of the right knee, and history of musculoskeletal pain.  (Tr. 16.)  The ALJ determined that Plaintiff's impairments did not meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, App. 1.  (Tr. 18.)  She found that Plaintiff retained the capacity to:

> [P]erform sedentary work as defined in 20 CFR 404.1567(a) and
> 416.967(a) such that she could lift 10 pounds occasionally and 5
> pounds frequently; stand and walk 2 hours in an 8-hour workday; sit
> for 6-8 hours in an 8-hour workday; no exposure to hazards [sic]
> working conditions such as working at heights or moving machinery;
> no highly detailed and highly complex job tasks but this would not

> necessarily preclude lesser detailed or more moderately detailed
> jobs.

(*Id.*)  Based on the vocational expert's testimony, the ALJ concluded that Plaintiff

could perform her past relevant work as a customer-service representative, and

therefore, found that she was not disabled.  (Tr. 21.)

## DISCUSSION

**I.     Standard of Review**

Congress has prescribed the standards by which Social Security disability

benefits may be awarded.  "Disability" under the Social Security Act means the

"'inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of

not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  "An individual shall be

determined to be under a disability only if his physical or mental impairment or

impairments are of such severity that he is not only unable to do his previous

work but cannot, considering his age, education, and work experience, engage in

any other kind of substantial gainful work which exists in the national economy."

42 U.S.C. § 423(d)(2)(A).

The claimant bears the burden of proving his or her entitlement to disability

benefits under the Social Security Act.  *See* 20 C.F.R. §§ 404.1512(a);

416.912(a); *Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000).  Once the

claimant has demonstrated that he or she cannot perform past work due to a

disability, "the burden of proof shifts to the Commissioner to prove, first that the claimant retains the residual functional capacity to do other kinds of work, and second, that other work exists in substantial numbers in the national economy that the claimant is able to do." *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000).

Review by this Court of the Commissioner's decision to deny disability benefits to a claimant is limited to a determination of whether the decision of the Commissioner is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Baker v. Barnhart*, 457 F.3d 882, 892 (8th Cir. 2006). "There is a notable difference between 'substantial evidence' and 'substantial evidence on the record as a whole.'" *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987) (citation omitted). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Reed v. Sullivan*, 988 F.2d 812, 814 (8th Cir. 1993) (internal quotation marks omitted). "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis." *Gavin*, 811 F.2d at 1199. "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings." *Id.* In reviewing the administrative decision, "'[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'" *Id.* (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

In reviewing the record for substantial evidence, the Court may not substitute its own opinion for that of the ALJ. *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993). The Court may not reverse the Commissioner's decision merely because evidence may exist to support the opposite conclusion. *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf*, 3 F.3d at 1213 (concluding that the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding). The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

## II. Analysis

### A. Mental Impairments

Plaintiff contends the ALJ erred in finding her mental impairments nonsevere. (Doc. No. 10, Pl.'s Mem. in Supp. of [Her] Mot. for Summ. J. ("Pl.'s Mem.") 10–12.) The Commissioner asserts that Plaintiff's argument is moot because the ALJ found Plaintiff had other severe impairments, and then the ALJ considered Plaintiff's mental impairments when she assessed Plaintiff's RFC. (Doc. No. 17, Def.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s Mem.") 7.) Alternatively, the Commissioner argues that the ALJ did not err in finding Plaintiff's mental impairments were nonsevere. (*Id.* at 8–14.)

Step two of the disability evaluation process requires a finding of whether the claimant suffers from a medically severe impairment or combination of

impairments.  20 C.F.R. §§ 404.1520(c), 416.920(c).  A nonsevere impairment or combination of impairments does not significantly limit the individual's physical or mental ability to do basic work activities.  20 C.F.R. §§ 404.1521(a), 416.921(a).  Basic mental work activities include understanding, remembering, and carrying out simple instructions, use of judgment, responding appropriately to supervision, coworkers, and usual work situations, and dealing with changes in a routine work setting.  *Id.* §§ 404.1521(b)(3-6), 416.921(b)(3-6).  The Supreme Court has described the severity standard at step two of the disability evaluation as a "de minimus standard," and only "those claimants with slight abnormalities that do not significantly limit any basic work activity can be denied benefits at step two." *Hudson v. Bowen*, 870 F.2d 1392, 1395–96 (8th Cir. 1989) (quoting *Bowen v. Yuckert*, 482 U.S. 137, 158 (1987)).

Substantial evidence in the record, including the neuropsychological findings, Dr. Lowe-Fierke's report, and Dr. Betts's opinion, supports a finding that Plaintiff had more than a slight abnormality in use of judgment, one of the enumerated basic work activities.  Based on Plaintiff's mental status examination, Dr. Lowe-Fierke concluded that Plaintiff demonstrated some deficits in social awareness and judgment, and stated that her insight regarding mental and emotional impairment was likely somewhat limited.  (Tr. 313.)  She also noted that judgment is a domain of executive functioning, of which Plaintiff had a known deficit.  (*Id.*)  Dr. Betts also attributed Plaintiff's poor decision making to her executive-function deficits.  (Tr. 385.)  For these reasons, the ALJ should have

found Plaintiff's mental impairments severe. *See, e.g.*, *Dewald v. Astrue*, 590 F. Supp. 2d 1184, 1206 (D.S.D. 2008) (stating that the ALJ erred in finding no severe mental impairment where test results suggested a neuropsychological component to a disability). Instead, the ALJ found Plaintiff had a combination of severe physical impairments and continued her analysis beyond step two.

The question, therefore, is whether the ALJ's error in finding Plaintiff's mental impairments nonsevere was harmless. To show an ALJ error was not harmless, the claimant "must provide some indication that the ALJ would have decided differently if the error had not occurred." *Byes v. Astrue*, 687 F.3d 913, 917 (8th Cir. 2012). The regulations provide that if a claimant has more than one impairment, the Social Security Administration "will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe' . . . when we assess your residual functional capacity." 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2). The ALJ complied with this regulation by considering evidence of Plaintiff's depression, ADHD, and neuropsychological findings in determining Plaintiff's RFC. (Tr. 16–17, 19–20.) This Court considers below whether the ALJ's RFC determination is supported by substantial evidence in the record. Because this Court concludes that it is, this Court also concludes that any error regarding Plaintiff's mental impairments at step two of the evaluation is harmless. *See Byes*, 687 F.3d at 917–18 (stating that the ALJ's application of an incorrect grid rule was harmless error because Byes was not disabled under the proper rule).

## B.    Medical Opinions

Plaintiff asserts the ALJ erred by relying on nonexamining physicians' and psychologists' opinions, and failed to appropriately weigh Dr. Betts's opinion, which was supported by clinical findings.  (Pl.'s Mem. 11–13.)  And even if the ALJ was not required to grant Dr. Betts's opinion controlling weight, Plaintiff argues the ALJ failed to indicate what weight was given to Dr. Betts's opinion. (*Id.* at 13.)  Plaintiff also asserts that the ALJ incorrectly stated that she gave some weight to Dr. Lowe-Fierke's opinion.  (*Id.* at 14–15.)

The Commissioner contends that Dr. Betts's opinion was not due controlling weight because her opinion is contrary to her own treatment records. (Def.'s Mem. 8.)  The Commissioner also argues that the ALJ need not discuss each factor in weighing a treating physician's opinion, but need only give good reasons for the weight given.  (*Id.* at 9–10.)  The Commissioner asserts the weight given to Dr. Betts's opinion was determined by its lack of support in the record.  (*Id.* at 10.)  In addition, the Commissioner disagrees with Plaintiff's interpretation of Dr. Lowe-Fierke's opinion, and asserts that the record supports the ALJ's conclusion that Plaintiff's attention and concentration did not limit her ability to perform work-related activities.  (*Id.* at 10–12.)  And the Commissioner asserts that Dr. Lowe-Fierke did not say Plaintiff was unable to get along with others.  (*Id.* at 12–13.)  Finally, the Commissioner argues that the ALJ gave appropriate weight to the state agency consultants' opinions, but did not primarily rely on them.  (*Id.* at 13–15.)

A treating physician's opinion is entitled to controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." *Pirtle v. Astrue*, 479 F.3d 931, 933 (8th Cir. 2007) (quoting *Prosch v. Apfel*, 201 F.3d 1010, 1012–13 (8th Cir. 2000), and 20 C.F.R. § 404.1527(d)(2) (2000)). If a treating physician's notes are inconsistent with his RFC opinion, the RFC opinion is not given controlling weight. *Id.* (citing *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006)).

Regardless of its source, the ALJ weighs every medical opinion, including treating physician opinions that are not given controlling weight and nonexamining source opinions, under the following factors: (1) length of treatment relationship and frequency of examination; (2) nature and extent of treatment relationship; (3) supportability of opinion; (4) consistency of the opinion with the record as a whole; (5) specialization of the source who gave the opinion; and (6) other factors brought to the ALJ's attention. 20 C.F.R. §§ 404.1527(c)(2)&(e), 416.927(c)(2)&(e). "Unless a treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant . . ." *Id.* §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii). "[T]he opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence." *Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999) (quoting *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998)).

27

Dr. Betts is Plaintiff's treating psychologist, and the only treating source to offer an RFC opinion. Dr. Betts filled out an impairment questionnaire in March 2010, in which she opined that Plaintiff was markedly limited in completing a normal workweek without interruptions from psychologically based symptoms and had other moderate or mild limitations in other areas of daily mental functioning. She opined that Plaintiff was capable of low-stress work, which she described as a sheltered position with positive coaching. Although she questioned whether Plaintiff had reduced intellectual functioning, Dr. Betts said that she had not done any intellectual testing of Plaintiff.

Although the ALJ did consider Dr. Betts' statements, it is clear that the ALJ gave Dr. Betts' opinion little or no weight because "the opinion of Dr. Betts has not been adequately supported by the documented treatment record." (Tr. 20.) This Court agrees with the ALJ's assessment. After Plaintiff's alleged onset of disability, there is only one treatment record regarding Plaintiff's therapy with Dr. Betts, a session on May 1, 2009. (Tr. 551–58.) On that date, Plaintiff said her stress had significantly decreased since she quit working. (Tr. 323.) She described to Dr. Betts that her activities included using a computer for research and playing games that provided mental stimulation, looking forward to upcoming social events and swimming lessons, and planning to babysit her grandchildren over a holiday weekend. (*Id.*) Plaintiff's mental status examination was normal, and Dr. Betts assessed a GAF score of 75. (*Id.*) None of the clinical findings Dr. Betts cited in support of her RFC opinion are found in her only treatment

28

record after the disability onset date.  (*Id.*)  Instead, the clinical findings cited by

Dr. Betts are found only in Plaintiff's January 2008 treatment record, long before

Plaintiff quit her job.  (Tr. 319–22.)[13]

The ALJ discounted Dr. Betts's opinion because she saw Plaintiff

infrequently and because her treatment records reflected Plaintiff's improvement.

The ALJ also cited other evidence that was inconsistent with Dr. Betts's opinion,

including Plaintiff's denial of any difficulty with finishing tasks and an April 2010

medical record showing that Plaintiff's depression was in remission.  After

Plaintiff's alleged disability onset date, there is no support in Dr. Betts's treatment

records for her opinion that Plaintiff would have marked difficulties in completing

a normal workweek without interruptions from psychologically based symptoms,

performing at a consistent pace without an unreasonable number and length of

rest periods, and traveling in unfamiliar places or using public transportation.

(Tr. 555–56); *see Krogmeier v. Barnhart*, 294 F.3d 1019, 1023 (8th Cir. 2002)

---

[13]    Based on Dr. Betts's letters to Plaintiff's counsel, Plaintiff was aware
Dr. Betts had additional treatment records, but there is nothing in the record to
indicate that Plaintiff sought to have these records submitted to the ALJ or the
Appeals Council.  Plaintiff has not argued the case should be remanded to obtain
these records.  Plaintiff was also aware of the disability paperwork Dr. Wolske
referred to in his treatment notes, as she asked him to complete the paperwork.
She did not seek to have these records submitted to the Social Security
Administration after seeing they were not in the record at the hearing.  (Tr. 30–
32, 52.)  Therefore, the Court considers any issue about missing records waived.
*See Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008) (finding no fault by the
Commissioner in failing to develop the record where the issue was not explicitly
raised by the claimant).

(affirming ALJ who discounted treating physician's opinion because it was inconsistent with his contemporaneous treatment notes.)

Further, the ALJ's RFC finding, limiting Plaintiff to no more than moderately detailed work, is consistent with Dr. Betts's opinion that Plaintiff would be only mildly limited in her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; sustain an ordinary routine without supervision; make simple work related decisions; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Thus, it appears the ALJ may have given Dr. Betts's opinion some weight, but her discount of Dr. Betts' opinion is well-supported and her analysis of Dr. Betts's opinion is supported by substantial evidence in the record.

Next, the ALJ said she accorded some weight to Dr. Lowe-Fierke's opinion. Dr. Lowe-Fierke opined that Plaintiff had a low-average ability to understand and retain information; her judgment was "less reliable"; her depression was fairly well controlled; she would likely have significant difficulties maintaining focus and maintaining concentration, persistence, or pace due to her seizure disorder; and her ability to understand and remember instructions, and to tolerate coworkers, handle supervision, and manage stress appeared fairly intact. (Tr. 314–15.)

Dr. Lowe-Fierke's opinion that Plaintiff's seizure disorder would cause significant difficulties in maintaining focus, concentration, persistence, and pace

are belied by the medical records and Plaintiff's own testimony. Plaintiff's seizure disorder was well-controlled, and her seizures were brief, infrequent, caused no more than a few seconds of staring, and Plaintiff felt fine when she came out of it. (Tr. 41–42, 298, 398, 439.) By limiting Plaintiff to no more than moderately detailed work, the ALJ gave some credit to Dr. Lowe-Fierke's opinion that Plaintiff had a low-average ability to understand and retain information. The ALJ's limitation to moderately detailed work is also consistent with Dr. Lowe-Fierke's observation that Plaintiff's ability to understand and remember instructions, and to tolerate coworkers, handle supervision, and manage stress appeared fairly intact. Dr. Lowe-Fierke did not opine that Plaintiff should be limited to brief and superficial contact with others, she simply observed that Plaintiff appeared able to interact appropriately in the "superficial and brief" contact of their own meeting. (Tr. 314–15.) Thus, the ALJ's analysis of Dr. Lowe-Fierke's opinion is supported by substantial evidence in the record as a whole.

Finally, the ALJ said she gave great weight to the mental assessments of the state agency consultants. (Tr. 20.) The state agency consultants opined that Plaintiff had no mental limitations. (Tr. 326–39, 353–55.) Nevertheless, the ALJ limited Plaintiff to no more than moderately detailed work. While there is evidence that Plaintiff has some deficit in executive functioning impairing her judgment, the only examples Dr. Betts provided of Plaintiff's impaired judgment were Plaintiff quitting her job and "lifestyle issues" contributing to problems with housing. Plaintiff's mental health treatment records suggest Plaintiff quit her

customer service job after ten years because she did not like the job, she felt stressed, and she had some issues with one supervisor.  After she quit the job, she felt much better and her depression and ADHD symptoms largely resolved.  Restricting Plaintiff from highly detailed or complex work is sufficient to accommodate her low-average ability to understand and somewhat impaired judgment.  Therefore, substantial evidence in the record supports the ALJ's mental RFC determination.

### C.    Credibility

Plaintiff argues that the ALJ applied the wrong standard in evaluating her credibility as indicated by boilerplate language in the ALJ's decision, which was the same language that was criticized by the Eighth Circuit in *Willcockson v. Astrue*, 540 F.3d 878, 881 (8th Cir. 2008).  (Pl.'s Mem. 16.)  Plaintiff also argues that the ALJ's credibility findings are insufficient, that her daily activities do not indicate an ability to work, and that her good work history is a positive credibility factor.  (*Id.* at 17–18.)  The Commissioner contends that the ALJ provided good reasons for her credibility determination.  (Def.'s Mem. 15–19.)

The ALJ did not rely solely on the boilerplate language criticized in *Willcockson* in her credibility analysis.  Instead, the ALJ found that Plaintiff's activities of household chores, cooking, managing finances, shopping, watching television, spending considerable time researching and playing games on a computer, attending a wedding, planning to take swimming lessons, doing volunteer work, singing karaoke, and caring for her grandchildren were

inconsistent with more than mild limitations in work-related mental activities.
(Tr. 16–17, 19–20); *see Wagner v. Astrue*, 499 F.3d 842, 852 (8th Cir. 2007)
(discounting credibility where Plaintiff regularly cooked, cleaned, shopped, went
to appointments, used a computer, watched television, and visited others).  The
ALJ also noted that Plaintiff discontinued her ADHD medication after quitting her
job.  (Tr. 20.)  Additionally, the medical records reflect that Plaintiff's physical
impairments were longstanding and had not worsened, and her chronic
impairments had not prevented her from working in the past.  (*Id.*)

The ALJ discounted Plaintiff's subjective complaints because she gave
conflicting reasons for quitting her job and applying for disability.  (Tr. 15.)  On
the one hand, Plaintiff said she quit because she was not making quotas, but she
also testified that she lost her job due to depression and problems with
coworkers.  (*Id.*)  Plaintiff also said she could not work primarily due to physical
problems because she needed a job where she could sit for a majority of the
time.  (*Id.*)  The ALJ acknowledged this and limited Plaintiff to sedentary work.
(Tr. 21.)  The ALJ also noted that Plaintiff's depression improved once she left
her work environment.  (*Id.*)  Moreover, the fact that Plaintiff gave inconsistent
reasons on different occasions for her inability to work (*see* Tr. 311), is a proper
basis to discount her subjective limitations.  *See Hogan v. Apfel*, 239 F.3d 958,
962 (8th Cir. 2001) (stating that closeness in time between job reprimand and
plaintiff's assertion that she quit work due to pain was one factor in ALJ's proper
credibility analysis); *Valley v. Astrue*, No. 4:10CV01393 JTR, 2011 WL 5999260

at *4 (E.D. Ark. 2011) (noting that the ALJ's proper credibility analysis addressed the plaintiff's varying reasons for not working).

### D. Vocational Expert Testimony

Based on her contention that the ALJ's RFC determination was flawed, Plaintiff asserts that the ALJ improperly relied on the vocational expert's response to a faulty hypothetical vocational question. (Pl.'s Mem. 19.) Specifically, Plaintiff asserts that even unskilled work requires the ability to appropriately respond to supervision, coworkers, and changes in a routine work setting, and she contends the evidence shows she is limited in these areas. (Pl.'s Mem. 19–20.) Finally, Plaintiff asserts that her credible testimony shows that she needed to elevate her legs to heart level three or four times per day for 10-15 minutes, and the vocational expert testified that this would preclude competitive employment. (Pl.'s Mem. 20.)

In response, the Commissioner argues that the ALJ properly discounted Dr. Betts's and Lowe-Fierke's opinions; therefore, it asserts that the ALJ did not need to include their opinions in the hypothetical question to the vocational expert. (Def.'s Mem. 19.) The Commissioner also argues that Plaintiff did not establish that she needed to elevate her legs to heart level multiple times a day. (*Id.* at 19–20.)

As discussed above, the Court finds that the ALJ's mental RFC finding is supported by substantial evidence in the record; thus, the ALJ properly relied on the vocational expert's response to a hypothetical question that included the RFC

finding. *See Goff v. Barnhart*, 421 F.3d 785, 794 (8th Cir. 2005) (concluding the ALJ "properly included only those limitations supported by the record as a whole in the hypothetical" and stating "[a] vocational expert's testimony based on a properly phrased hypothetical question constitutes substantial evidence") (quotations omitted). Plaintiff asserts that the ALJ should have included a physical limitation that she was required to elevate her legs to heart level three or four times a day. Although there are several references in the record suggesting that Plaintiff should treat her leg swelling by elevating her legs, none of those records state that she was required to elevate her legs above heart level, or that she was required to do so three or four times for 10-15 minutes during each workday. (Tr. 371, 266.) Although Dr. Wolske noted that he completed disability paperwork for Plaintiff (Tr. 371), and this might contain a recommendation regarding leg elevation, Plaintiff apparently did not submit this paperwork to the ALJ because it is not in the Administrative Record, and Plaintiff has not asked to supplement the record. Further, when Plaintiff was working ten-hour days in October 2008, she stated that she was able to elevate her legs on a stool occasionally and the only treatment she required was new compression garments. (Tr. 462.) And after she quit working, Plaintiff admitted her legs swelled only once every three months. (Tr. 39–40.) The record simply does not support Plaintiff's subjective limitation for elevating her legs. Therefore, this Court concludes the ALJ did not make an error in relying on the vocational expert's testimony that Plaintiff could perform her past relevant work.

# RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.      Plaintiff's Motion for Summary Judgment (Doc. No. 9), be **DENIED**;

2.      Defendant's Motion for Summary Judgment (Doc. No. 16), be

**GRANTED**; and

3.      If this Report and Recommendation is adopted, that this case be

**DISMISSED WITH PREJUDICE**, and judgment be entered accordingly.


Date: June 24, 2013              _s/ Jeffrey J. Keyes_____
                                 JEFFREY J. KEYES
                                 United States Magistrate Judge


Under D. Minn. Loc. R. 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **July 8, 2013**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within **fourteen days** after service thereof. A judge shall make a de novo review of those portions to which objection is made. This Report and Recommendation does not constitute on order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.